# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

In re EFFEXOR ANTITRUST LITIGATION

Civil Action No. 3:11-cv-5661 (PGS)(LHG)

**MEMORANDUM
AND ORDER**

**SHERIDAN, U.S.D.J.**

Presently before the Court is Defendants Wyeth Inc., Wyeth Manufacturing Limited, Wyeth Ireland Pharmaceutical Products (collectively, "Wyeth"), Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals Industries Limited's (collectively, "Teva") Motion for Judgment on the Pleadings pursuant Federal Rule of Civil Procedure 12(c), regarding End-Payer Plaintiffs' Third Amended Consolidated Complaint. (ECF No. 165).[1] This case arises from allegations that two drug companies, Wyeth and Teva, engaged in an anticompetitive scheme that prevented the generic drug of Effexor XR from entering the market. Plaintiffs are end-payor purchasers (hereinafter "EPP") who claim to have paid inflated costs for the brand-named drug, Effexor XR, due to, among other things, a delayed entry provision included in Wyeth and Teva's settlement agreement. Unlike the Direct Purchaser Plaintiffs, who assert claims under the Sherman Act, the EPPs base their claims on their respective state's antitrust and consumer protection acts.

---

[1] Initially, Defendants also sought dismissal of opt-out indirect purchaser plaintiffs' complaint. However, being that both opt-out plaintiffs have since voluntarily dismissed their actions, these arguments are not considered. *See* Docket No. 11-cv-5590 (ECF Nos. 148, 158).

# BACKGROUND

## I. Parties

Plaintiffs are a collection of organizations including insurance carriers, Taft-Hartley funds, municipalities, and individuals, who have been indirectly affected by Defendants' alleged schemes. For example, jointly administered Taft-Hartley fund and employee welfare benefit plaintiffs include: A.F.L.-A.G.C. Building Trades Welfare Plan and IBEW-NECA 505 Health & Welfare Plan, both of which are self-insured health and welfare benefit plans in Alabama and Florida, and Alabama, respectively (*Id.* at ¶¶ 20-21); Painters District Council No. 30 Health and Welfare Fund, a self-insured health and welfare benefit plan located in Illinois (*Id.* at ¶ 24); New Mexico United Food and Commercial Workers Union's and Employers' Health and Welfare Trust Fund and Plumbers and Pipefitters Local 572 Health and Welfare Fund, Taft-Hartley funds from New Mexico and Tennessee, respectively (*Id.* at ¶¶ 23, 25); Sergeants Benevolent Association Health and Welfare Fund, a New York health and welfare fund (*Id.* at ¶ 27). Health insurance carrier plaintiffs include Louisiana Health Services Indemnity Company d/b/a Bluecross/Blueshield of Louisiana, a corporation licensed to conduct business in Louisiana that provides health benefits to covered members. (*Id.* at ¶ 22 ). Municipality plaintiffs include the City of Providence, Rhode Island, a municipal corporation that operates a self-insured health and welfare benefit plan. (*Id.* at ¶ 26). Finally, there is one named individual Plaintiff, Patricia Sutter, who is a Maine citizen. (*Id.* at ¶ 28). All Plaintiffs purchased, paid, and/or provided reimbursement for Effexor XR or its generic equivalent. (*Id.* at ¶¶ 20-28). Plaintiffs contend that they were all injured as a result of Defendants' anticompetitive schemes, since they paid a premium for the medication. (*Id.*).

Defendants in this case are Wyeth and Teva. (*Id.* at ¶¶ 29-38). Wyeth Inc., Wyeth Pharmaceuticals, Inc., Wyeth-Whitehall, and Wyeth Pharmaceuticals Company are referred to collectively as Wyeth. (*Id.* at ¶ 33). Wyeth is a wholly owned subsidiary of Pfizer with its principal place of business in New Jersey. (*Id.* at ¶ 29). Wyeth wholly owns Wyeth Pharmaceuticals, Inc., which is located in Pennsylvania. (*Id.* at ¶ 30). Wyeth-Whitehall Pharmaceuticals and Wyeth Pharmaceuticals Company are Puerto Rican corporations that are subsidiaries of Wyeth. (*Id.* at ¶¶ 31-32). The Complaint also identifies "Wyeth applicants," who are inventors and prosecuting attorneys that were responsible for purportedly fraudulently obtaining patents. (*Id.* at ¶ 34). Teva Pharmaceutical Industries Limited and Teva Pharmaceuticals USA, Inc. are referred to collectively as Teva. (*Id.* at ¶ 37). Teva Limited is an Israeli corporation that develops, manufactures, markets, and distributes pharmaceutical goods. (*Id.* at ¶ 36). Teva USA is a wholly owned subsidiary of Teva Limited that is located in Pennsylvania, which focuses its efforts primarily on the generic pharmaceuticals business. (*Id.*).

## II. Facts

In the Complaint, EPPs identify several anticompetitive schemes that purportedly give rise to the present lawsuit. Specifically, Plaintiffs allege that Defendants fraudulently obtained three separate, but related patents, from the United States Patent and Trademark Office (PTO); listed these patents in the book of Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book"); engaged in sham litigation relating to these patents; entered into an unlawful reverse payment agreement with Teva; and manipulated the 180 day first-to-file period[2] to sustain

---

[2] 21 U.S.C. § 355(j)(5)(B)(iv).

Wyeth's and Teva's exclusivity and collectively prevent other generic companies from entering the market. The Court discusses each allegation in turn.

*1. Walker Process and Fraudulent Procurement*

EPPs first present a *Walker Process*[3] claim against Wyeth, based on Wyeth's fraudulent procurement and enforcement of three separate patents. By way of background, in 1985, Wyeth – then operating as American Home Products – acquired a patent for the compound venlafaxine hydrochloride (venlafaxine), commonly referred to as the Husbands patent. (*Id.* at ¶ 70). Five years later, December 1993, Wyeth received FDA approval of its New Drug Application for Effexor, an antidepressant drug whose active pharmaceutical ingredient is venlafaxine. (*Id.* at ¶ 71). This initial patent was for an "instant release" formulation; that is, the tablet "dissolves rapidly, resulting in a rapid increase in blood plasma levels of venlafaxine shortly after administration." (*Id.*). According to the Complaint, the Husbands patent protected any type of venlafaxine-based product that Wyeth created from generic competition before June 13, 2008.[4] (*Id.* at ¶ 72). As such, Wyeth had market exclusivity for venlafaxine products for 14 ½ years. (*Id.* at ¶ 73).

However, Effexor's instant release formulation had several significant drawbacks. First, the spike of venlafaxine into the patient's blood plasma levels could cause nausea and vomiting. (*Id.* at ¶ 75). Second, because the drug was rapidly absorbed into the body, patients were required to take the medication several times a day. (*Id.*). In response, Wyeth sought to develop an extended release formulation of Effexor to address these drawbacks. (*Id.*). According to the Complaint,

---

[3] *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965).

[4] According to the Complaint, "[t]he patent would have expired much earlier than 2008, but Wyeth received a significant extension to reflect the time it took the FDA to approve its NDA for Effexor." (*Id.*).

"[b]y the early 1990s, methods for achieving sustained or extended release of the active ingredient in pharmaceuticals were well known in the drug industry." (*Id.* at ¶ 77). To create an extended release form of venlafaxine, Wyeth took two approaches: (1) they worked in-house and (2) entered into a business venture agreement with ALZA Corporation, a pharmaceutical formulation company that specialized in extended release technology. (*Id.* at ¶ 79).

Wyeth's in-house development team used a coated spheroid approach to create its extended release version of Effexor, which had been previously utilized in another patented drug, Inderal LA. (*Id.* at ¶ 80). The coated spheroid approach used in Inderal LA was previously patented in the late 1970s and received Patent No. 7,138,475 ('475 Patent). (*Id.* at ¶ 82). As a result, Plaintiffs contend that Wyeth's approach to extending the release of Effexor was already considered a prior art, despite their subsequent effort to seek additional patent protections of the same. (*Id.* at ¶ 82).

Meanwhile, ALZA used its osmotic-controlled release oral delivery system (hereinafter, "OROS") to create an extended release version of Effexor. (*Id.* at ¶¶ 86-88). As such, by 1993, Wyeth had two formulations of extended release venlafaxine and ultimately chose to focus on developing its own encapsulated spheroid version of Effexor. (*Id.* at ¶¶ 89-90). According to the Complaint, clinical studies "failed to establish any statistically significant improvement of the extended release over the instant release with respect to side effects such as nausea." (*Id.* at ¶ 90). As such, Plaintiffs aver that "Wyeth could not truthfully claim there was any valid scientific basis for claiming that the extended release version reduced side effects when compared to the instant release." (*Id.*).

In any event, in June 1993, Wyeth made its first attempt to receive additional patent protections for venlafaxine. (*Id.* at ¶ 91). The 1993 application sought a method-of-use patent for using venlafaxine for various medical conditions, including obesity, anxiety, and post-traumatic

stress disorder, just to name a few. (*Id.*). However, this application did not specify any particular venlafaxine formulation and was later abandoned. (*Id.* at ¶¶ 91-92). Less than two years later, January 1995, Wyeth sought another method-of-use patent for using venlafaxine to treat hypothalamic menopause in non-depressed women. (*Id.* at ¶ 94). Again, they did not identify a particular formulation for approval, but did mention a sustained release composition. (*Id.* at ¶¶ 94-95). The following year, April 1996, Wyeth received FDA approval of this composition and Patent No. 5,506,270 ('270 Patent). (*Id.*).

As previously mentioned, ALZA had also developed an extended release formulation for venlafaxine, using its OROS technology; as such, in May 1993, ALZA also sought to secure patent protection for its formulation, which received FDA approval in August 2002 as Patent No. 6,440,457. (*Id.* at ¶ 96). In addition, the World Intellectual Property Organization published a patent application ('589 PCT application) that was assigned to ALZA in 1994, which claims priority to ALZA's patent application. (*Id.* at ¶ 97). The '589 patent specifies the extended release osmotic formulation that ALZA developed and explained that an extended release formulation in general reduces negative side effects because these side effects result from spikes in blood plasma levels that occur when taking medication multiple times a day. (*Id.* at ¶¶ 98, 101).

According to the Complaint, beginning in 1996, Wyeth made several attempts to receive additional patent protections for Effexor XR. (*Id.* at ¶ 103). By this time, Wyeth had already obtained a method-of-use patent for using venlafaxine to treat hypothalamic menopause in non-depressed women and ALZA's '589 patent had been published. (*Id.*). This being said, according to the Complaint, "Wyeth submitted six sequential applications that led to three patents, the '171, '958, and '120 patents, each of which contained ostensibly independent method-of-use claims." (*Id.* at ¶ 104). Plaintiffs aver that Wyeth defrauded the PTO in obtaining these patents and, as a

result, prevented generic extended release venlafaxine formulations from entering the market until June 2008. (*Id.*).

In March 1996, Wyeth applied for a provisional utility patent[5] ('006 application) for extended release venlafaxine. The '006 application described the proposed patent as "an extended release (ER), encapsulated formulation containing venlafaxine hydrochloride." (*Id.* at ¶ 120). According to Plaintiffs, the phrase "encapsulated extended release formulation" had two very distinct interpretations. One interpretation could indicate that '006 application concerned the coated spheroid formulation that Wyeth had previously developed, which would limit the patent protection to only this specific formulation design – thereby enabling competing companies to enter the market utilizing a different design that would not violate Wyeth's patent. (*Id.* at ¶ 123). (*Id.*). Alternatively, the phrase could be understood to encompass every formulation of venlafaxine; however, such an overly broad interpretation would render the patent invalid and unenforceable, since it was already disclosed in the '270 Patent and the '589 application submitted by ALZA. (*Id.* at ¶ 124).

The following year, March 1997, Wyeth filed a non-provisional application (the '137 application) that was almost identical to the '006 application. (*Id.* at ¶ 108). In its application, Wyeth did not disclose the existence of the '270 Patent or the '589 PCT Application. (*Id.*). However, the PTO Examiner discovered both and informed Wyeth that its claims about nausea and the spikes in blood plasma were not patentable as independent claims. (*Id.* at ¶ 136). Moreover, the Examiner noted that the '137 application could only be enforceable if Wyeth

_____

[5] A utility patent application seeks to protect a new, useful, or nonobvious process or composition and a provisional application only requires a brief written description of the subject matter that is sought to be protected. Essentially, a provisional application "allows an inventor to establish a date of invention one full year before the inventor actually submits evidence of [the] invention's patentability." (*Id.* at ¶ 108).

narrowed the description of the invention to the specific formulation that it created. (*Id.*). Eventually, Wyeth abandoned the '137 application and, in November 1997, filed a continuation-in-part application (the '328 application), which included additional information not mentioned in the '006 and '137 applications. (*Id.* at ¶¶ 109-10). Plaintiffs contend the '328 application was identical to the '137 application; however, despite having an obligation to disclose the claims that were previously rejected, Wyeth failed to do so in hopes that another PTO Examiner would overlook the ambiguous language. (*Id.* at ¶¶ 143, 147). This being said, Wyeth eventually abandoned this application as well. (*Id.* at ¶ 152).

Shortly after abandoning the '328 application, Wyeth filed another continuation-in-part application (the '629 application), which claimed priority over all three previous applications. (*Id.* at ¶ 111). The '629 application eventually led to the issuance of Patent No. 6,274,171 (the '171 Patent) in August 2001. (*Id.* at ¶ 112). The '171 Patent was comprised of 25 claims, which included the extended release encapsulated spheroid version of venlafaxine. (*Id.* at ¶ 112). It also claimed to reduce the drug's concentration in patient's blood plasma and incidents of nausea and vomiting. (*Id.*). Again, Plaintiffs contend Defendants did not disclose the rejection of the similar claims in the '137 application examined by the PTO Examiner. (*Id.* at ¶ 157). By failing to disclose the PTO's prior rejection and explain the meaning of the '270 Patent, Plaintiffs aver that Wyeth committed fraud on the PTO in obtaining the '171 Patent. (*Id.* at ¶¶ 157-58).

Two months before the '171 Patent was issued, Wyeth filed a divisional application in June 2001 (the '412 application), which sought another method-of-use patent based on reducing incidents of nausea and vomiting, the drug's concentrations in the patient's blood plasma, and daily drug use. (*Id.* at ¶ 165). According to Plaintiffs, "[t]he specifications and claims of the '412 application were identical to those in the '629 application." (*Id.* ¶ 161). However, unlike the other

applications, the '412 referred to the formulation as "an extended release formulation" rather than "an encapsulated extended release formulation" as in the previous applications. (*Id.* at ¶¶ 161-62). Defendants again did not disclose that the '270 Patent "identified the existence of an extended release formulation of venlafaxine hydrochloride that rendered their method-of-use claims unpatentable." (*Id.* at ¶ 162). By failing to provide this information to the PTO Examiner, the '412 application eventually resulted in the issuance of the Patent No. 6,419,958 (the '958 Patent) in July 2002. (*Id.* at ¶ 164). However, as noted above, the '270 Patent previously procured included a once a day venlafaxine formulation that spread its dosage over time, so Wyeth filed a provisional application, including claims for nausea and vomiting, to avoid being precluded by the '270 Patent. (*Id.* at ¶ 117-18).

Finally, in September 2001, Wyeth filed the '965 application, another continuation in part application, that contained similar claims as the '412 application. (*Id.* at ¶ 166-67). By not disclosing the rejection of the prior applications, the '965 application resulted in the issuance of Patent No. 6,403,120 in June 2002 (the '120 Patent). (*Id.* at ¶ 170).

According to the Complaint, "Wyeth's repeated pattern of nondisclosure and withholding highly material information in serial patent applications for virtually identical claims" evinces its intent to deceive the PTO. (*Id.* at ¶ 184). As such, "[b]ut for this fraud on the PTO," Plaintiffs aver that the '171, '120, and '958 Patents would never have been issued. (*Id.* at ¶ 185).

*2. Wrongful Orange Book Listing and Sham Litigation*

After procuring the '171, '120, and '958 Patents, Wyeth then listed all three in the Orange Book; all three patents expired on March 20, 2017. (*Id.* at ¶¶ 14, 112, 114 116). Thereafter, Plaintiffs claim that Wyeth engaged in sham litigation against seventeen generic manufacturers. (*Id.* at ¶ 262). Plaintiffs claim that at least seventeen generic manufacturers sent Wyeth

certifications informing it that they intended to manufacture generic versions of Effexor XR, which would not infringe Wyeth's patents. (*Id.* at ¶ 265). In response, Wyeth sued each generic for infringing on the '171, '120, and '958 Patents. (*Id.* at ¶ 266). According to the Complaint, Wyeth was aware that its method-of-use patents were invalid or unenforceable; yet, nevertheless chose to seek its enforceability against generic manufacturers. (*Id.* at ¶ 267). The purposes of these "sham patent suits was to prevent, delay, and/or minimize the success of the entry of generic competitors, which would have sold generic equivalents of Effexor XR in the United States at prices significantly below Wyeth's prices . . . and therefore would have taken most of Wyeth's market share." (*Id.* at ¶ 270). As such, by blocking the market entry of generic Effexor XR, Wyeth prevented the average market price of its brand name drug from declining dramatically. (*Id.*).

*3. Reverse Settlement Allegations*

Finally, Plaintiffs challenge the validity of a reverse settlement agreement made between Wyeth and Teva, after Wyeth initially sued Teva for patent infringement of its three patents. (*Id.* at ¶¶ 272-304). On March 24, 2003, Wyeth sued Teva for infringing on its '171, '120, and '958 patent in the District of New Jersey. (*Id.* at ¶ 275). One of the key issues before the court was whether the term "extended release formulation" was to be construed broadly or limited to the spheroid formulation developed by Wyeth, which – as discussed above – would enable generic manufactures to design a different formulation that would not infringe on Wyeth's patents. (*Id.* at ¶ 276). At the *Markman* hearing, the court ultimately interpreted the phrase to mean the latter, explaining that "one of ordinary skill in the art would construe [extended release formulation] to include specific ingredients." (*Id.*). According to the Complaint, such a finding was fatal to Wyeth's case; as such, Wyeth sought to settle the matter with Teva and, as a result, avoid other generic companies challenging Wyeth's patent. (*Id.*).

10

On November 2, 2005, the two signed a joint settlement and release agreement. (*Id.* at ¶ 279). As part of the settlement, the parties agreed that the district court's prior *Markman* ruling would be vacated, thereby requiring other generic companies to relitigate the "extended release formulation" issue that the court had previously found in Teva's favor. (*Id.* at ¶ 280). As it pertained to instant release Effexor, Wyeth allowed Teva to sell its generic version prior to the expiration of the patent in June 2008; in addition, Wyeth agreed not to compete with Teva by releasing its own authorized generic during that same period. (*Id.* at ¶ 281). As a result, Teva had at least a year and a half market exclusivity of generic instant release Effexor. (*Id.* at ¶ 283). The agreement also included a delayed entry provision, wherein Teva agreed to delay market entry for its generic extended release Effexor until as late as July 2010. (*Id.* at ¶ 284). In return, "Wyeth promised Teva that Wyeth would not market an authorized generic version of extended release venlafaxine during at least Teva's six-month 'exclusivity' and possibly longer." (*Id.*). According to the Complaint, by effectively blocking any other competing generic manufactures from entering the market, "the Wyeth-Teva agreement worked a huge, and devastating, impact on competition in the market for extended release venlafaxine." (*Id.* at ¶ 286).

Plaintiffs bring this case on behalf of themselves and all End-Payor class members to recover damages, calculated by the increased price they had to pay due to Wyeth's conduct in delaying the market entry of generic Effexor XR. (*Id.* at ¶ 411). The class contains individuals or entities who purchased or paid for Effexor XR and/or its generic version for consumption by themselves, their families, or members, employees, insureds, participants, or beneficiaries in Arizona, California, Florida, Illinois, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, Wisconsin, and the District

of Columbia. The Class sues for overage damages occurred from June 14, 2008 until the effects of Defendants' conduct cease. (*Id.*).

The Complaint outlines four different claims for relief in the class action. The first is for monopolization under state law against Wyeth. (*Id.* at ¶ 421). The conduct giving rise to this claim is the fraudulent obtainment of the '171, '958, and '120 Patents, its listing in the Orange Book, its sham litigation, and the unlawful reverse settlement agreement with Teva. (*Id.* at ¶ 424). The same factual allegations and theories asserted in Count I are again alleged in Count II against all Defendants. (*Id.* at ¶ 439). In Count III, Plaintiffs allege conspiracy to restrain of trade against all Defendants. (*Id.* at ¶¶ 448). Finally, Plaintiffs allege a claim unfair or deceptive trade practices against all Defendants. (*Id.* at ¶ 456). Plaintiffs contend that as a result of Wyeth's anticompetitive acts or practices, Plaintiffs and the Class were deprived of the opportunity to obtain a less expensive, generic equivalent to Effexor XR. As such, Plaintiffs seek compensation from Defendants in the form of damages.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) permits a party to dismiss a suit "[a]fter the pleadings are closed . . . but early enough not to delay trial." Fed. R. Civ. P. 12(c). "A Rule 12(c) motion for judgment on the pleadings is treated like a motion to dismiss under Rule 12(b)(6)." *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 324 (D.N.J. 1999). Under either rule, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Id.* For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Wireless Media Innovations, LLC v. Maher Terminals, LLC*, 100 F. Supp. 3d 405, 407 (D.N.J. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d

868 (2009)).  As such, "[a] complaint should not be dismissed unless it appears beyond doubt that 'the facts alleged in the complaint, even if true, fail to support the claim.'" *Syncsort Inc.*, 50 F. Supp. 2d at 325.

**ANALYSIS**

Defendants presently challenge EPPs' Complaint on five separate bases.  First, Defendants contend that EPPs' Complaint should be dismissed in its entirety based on federal preemption principles.  Second, Defendants argue that several state law claims are time-barred.  Third, Defendants contend that certain states require pre-filing notices, which Plaintiffs failed to comply with, and proscribe class actions under their respective consumer protection statutes.  Fourth, Defendants aver that EPPs' state antitrust claims fail because they lack standing and fail to plead a concerted act.  Finally, Defendants challenge EPPs' consumer protection claims for failing to comply with various state consumer protection law requirements.  The Court addresses each challenge in turn.

## I.      Federal Law Preemption

Defendants first seek dismissal of Plaintiffs' state law claims in its entirety, since their state law claims are preempted by federal law. Plaintiffs respond, contending that because their claims are based on antitrust and consumer fraud theories, preemption is inapplicable.

"Federal patent law preempts state law claims to the extent that state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' in enacting the patent laws." *Wawryzynski v. H.J. Heinz Co.*, 574 F. App'x 99, 102 (3d Cir. 2014) (quoting *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979)).  Notably, "district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. No State court shall have jurisdiction

over any claim for relief arising under any Act of Congress relating to patents, plant variety protection, or copyrights." 28 U.S.C. § 1338(a). "Under § 1338(a), then, jurisdiction extends 'only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims.'" *In re Lipitor Antitrust Litig.*, 855 F.3d 126, 143 (3d Cir. 2017) (quoting *Christianson v. Colt Industr. Operating Corp.*, 486 U.S. 800, 809 (1986)). As such, the Court is tasked with determining whether the plaintiff's claims "arise under" patent law. *Id.* at 144. "[I]f on the face of a well-pleaded complaint there are reasons completely unrelated to the provisions and purposes of the patent laws why the plaintiff may or may not be entitled to the relief it seeks," then the claims do not "arise under" patent law. *Id.* (internal quotation marks and citations omitted).

Defendants present two theories supporting their position that Plaintiffs' state law claims are preempted. First, because Plaintiffs' claims are based on the purportedly fraudulent procurement and enforcement of the '171, '958, and '120 Patents, they must demonstrate that the patent is invalid or unenforceable, which is preempted under federal patent law. Second, to the extent that Plaintiffs' antitrust claims are based on the reverse settlement agreement, they are preempted since they must demonstrate the validity of the generic patents, which necessarily implicates patent law.

*1.     Fraudulent Patent Procurement and Enforcement*

Turning first to Defendants' federal patent preemption argument, Defendants argue that Plaintiffs' state law claims require them to plead and prove that the patent is invalid or unenforceable under federal patent law. According to Defendants, the allegations in Plaintiffs'

complaint that trigger federal patent law include: (1) the fraudulent procurement of the '171, '958, and '120 Patents; (2) the fraudulent patent listing of the '171, '958, and '120 Patents in the FDA's Orange Book; and (3) the "sham" litigation against seventeen generic manufacturers, seeking to enforce the '171, '958, and '120 Patents. Defendants contend that these allegations require first knowing whether the patent at issue is invalid or unenforceable. If the patent was valid, then the obtainment and enforcement of same would be lawful. As such, Defendants argue that because federal patent law is necessary to support these theories, they are preempted by federal law.

However, Defendants' arguments are in direct contravention with the Third Circuit's recent holding in *Lipitor*, 855 F.3d at 126. In *Lipitor*, the Third Circuit explicitly held that the present matter does not "arise under" federal patent law. The Third Circuit held that although a resolution of a substantial question of federal patent law is necessary for a fraudulent patent claim, that alone is not sufficient to establish that the Federal Circuit has jurisdiction. *Id.* at 143. The court explained that unless every theory of the claim requires resolution of a substantial question of federal law, it does not "arise under" federal patent law and, therefore, the Third Circuit has jurisdiction. *Id.* The court interpreted "arises under" to mean that every theory of the claim requires the resolution of a substantial question of federal law, if it does not, federal patent law will not preempt. *Id.* Here, even if the allegations in the Complaint present substantial questions of patent law, because the antitrust allegations and litigation do not, this case does not arise under federal patent law for purposes of federal patent preemption. *Id.* (quoting *Christianson*, 486 U.S. at 812).

Moreover, federal patent law does not preempt a state law claim in which a patent law issue is implicated if "the state law cause of action [i.] includes additional elements not found in the federal patent law cause of action and [ii.] is not an impermissible attempt to offer patent-like protection to subject matter addressed by federal law." *Dow Chem. Co. v. Exxon Corp.*, 139 F.3d

1470, 1473 (Fed. Cir. 1998). In *Dow*, the defendant was issued a patent that disclosed certain wire and cable devices manufactured using a particular insulating polymer. *Id.* at 1471. At about the same time, the plaintiff introduced its own line of polymer products and filed a complaint contending that its polymer did not infringe on the defendants' patent since the defendants' patent was invalid and unenforceable. *Id.* at 1471-72. In addition, the plaintiff asserted a state-law unfair competition claim, alleging that the defendant obtained its patent through inequitable conduct before the PTO. *Id.*

Finding patent preemption inapplicable, the Federal Circuit explained that there are three objectives for patent law: (1) to provide an incentive to invent; (2) to promote the full disclosure of inventions; and (3) to ensure "that which is in the public domain cannot be removed therefrom by action of the states." *Id.* at 1474 (quoting *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480-81 (1974)). With these objectives in mind, the *Dow* court held that when the state law cause of action includes additional elements not found in the federal patent law and state law is not an obstacle to the objectives of federal patent law, it is not preempted even if patent law is implicated. *Id.* at 1473. As such, the Federal Circuit held that because the state law unfair competition claim included additional elements not found in federal patent law and did not otherwise conflict with the objectives of federal patent law, its claims were not preempted. *Id.* at 1478-79.

Here, as in *Dow*, the EPPs state antitrust and consumer protection claims require proof of elements not found in a patent cause of action. As discussed earlier, the purpose for patent protection is to provide an incentive to invent, to promote the full disclosure of inventions and to ensure "that which is in the public domain cannot be removed therefrom by action of the states." Antitrust and consumer protection law protect consumers from being overcharged for products, which is a wholly different goal than patent law.

This is also consistent with the Court's decision in *In re Thalomid and Revlimid Antitrust Litig.*, No. 14-6997, 2015 U.S. Dist. LEXIS 177541 (D.N.J. Oct. 29, 2015), where the court held that even if a state court must adjudicate a question of federal patent law, it is not preempted if it includes additional elements not part of a federal cause of action. *Id.* at *61-63. In *Thalomid*, the plaintiffs, who were indirect purchasers, alleged that the defendants created an antitrust scheme by obtaining patents through fraud on the PTO and bringing sham lawsuits to delay generic brands from entering the market. *Id.* at *4-5. As is the case here, the defendants argued that the plaintiffs' antitrust claims should be preempted by federal patent law since they alleged that they obtained the patents through unjust conduct with the PTO. *Id.* at *61-62. Relying on *Dow*, the court held that even if a question of federal patent law must be adjudicated, the state law claim is not preempted, as long as it contains additional elements not part of a federal patent cause of action. *Id.* Finding the allegations were also premised on bad faith in the marketplace (an element not required in patent law) the Court reasoned that federal patent preemption was not warranted.

Here, similar to *Thalomid*, the EPPs allege that the patents were obtained through fraud on the PTO, Wyeth improperly listed the '171, '958, and '120 Patents in the Orange Book, the generic drug was delayed entry because of sham litigation, and a reverse payment settlement agreement was negotiated to prolong a monopoly. As such, because EPPs claims are predicated on claims wholly separate from the federal patent law, they are not preempted.

2.    *Antitrust Allegations*

Defendants next argue that because Plaintiffs' antitrust claims arise from the reverse settlement agreement, it implicates federal patent law and, therefore, must be preempted. Defendants rely principally on the Third Circuit's decision in *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132 (3d Cir. 2017) for support. In *Wellbutrin*, the Third Circuit held that in order to

allege an antitrust injury, based on the reverse settlement agreement between pharmaceutical companies, it is the plaintiffs' burden to demonstrate that "but for" this agreement, the generic drug would have entered the market sooner. *Id.* at 164-65. As such, if a regulatory scheme or patent law would otherwise prevent the generic drug from market entry, there can be no antitrust injury. *Id.* Here, Defendants argue that because Plaintiffs must demonstrate that the generic patents would have entered the market, but for the settlement, this necessarily implicates patent law.

In *Wellbutrin* the defendant obtained FDA approval for bupropion hydrochloride, which was marketed as "Wellbutrin." *Id.* at 145. Between September 2004 and May 2005, four generic manufacturers filed ANDAs, requesting authorization to market generic versions of Wellbutrin. *Id.* On February 9, 2007, the parties entered into a settlement agreement, which included a pay-for-delay scheme, wherein the defendants agreed to not launch their own authorized generic version of the drug for 180 days and, in return, the generic manufacturer would not launch a low dosage generic version of the drug until an agreed triggering event. *Id.* at 146, 162. In May 2008, the plaintiffs filed suit, alleging that the defendants conspired with generic manufacturers to prevent a generic version of the drug from entering the market. *Id.* at 146. The Third Circuit held that because there was a patent blocking the generic versions' launch, the settlement agreement did not cause the injury. *Id.* at 165. Put differently, the Third Circuit explained that the plaintiffs were unable to prove that "but for" the defendants' settlement agreement, the generic drug would have entered the market, since a patent blocking the generic versions would have nevertheless created the same effect. *Id.*

The Court rejects Defendants' expansive reading of *Wellbutrin* to hold that antitrust claims, based on reverse settlement agreements, are preempted by federal patent law. *Wellbutrin* simply sets forth considerations to be made when presented with an issue of antitrust standing, based on

reverse settlement agreements. At no point in its decision did the Third Circuit mention that such an issue would trigger federal patent preemption. *See Wellbutrin*, 868 F.3d at 163-70. As such, while an antitrust claim may relate to patent issues, it is not always the case that it is necessary to explore its validity. Secondly, as noted above in *Lipitor*, the Third Circuit has already held that this case was not preempted by federal law, since Plaintiffs' claims are predicated on theories of antitrust, not patent law. *Lipitor*, 855 F.3d at 146. As such, because Plaintiffs' antitrust claims do not implicate federal patent law, the Court will not dismiss these claims based on preemption. Finally, *Wellbutrin* was decided at summary judgment, where the district court had before it a full and complete record and was, therefore, capable of making determinations not presently available at the pleading stage. For these reasons, the Court finds Defendants' arguments, relying on *Wellbutrin*, premature.

In sum, the Court denies Defendants' motion for judgment based on preemption principles.

## II.     Statute of Limitations

Defendants argue that EPPs' antitrust claims in Kansas, Mississippi, Montana, and Tennessee, and consumer protection claims in Illinois, New York, and Tennessee should be dismissed since these statutes impose a statute of limitations of four years or less. Relying on the continuing-violation doctrine, EPPs contend that their claims are timely. The Court agrees.

"Under the continuing-violation doctrine, 'when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period.'" *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 746 (E.D. Pa. 2014) (quoting *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001)). Indeed, the Supreme Court has considered this doctrine in the antitrust context:

> Antitrust law provides that, in the case of a "continuing violation," say a price fixing conspiracy that brings about a series of unlawfully high priced sales over a period

of years, each overt act that is part of the violation and that injures the plaintiff, e.g., each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal quotation marks and citations omitted). As such, to the extent Plaintiffs continue to purchase a good "at a supracompetitive price [it] constitute[s] a continuing violation." *Niaspan*, 42 F. Supp. 3d at 746. In fact, almost "[e]very court to have considered this issue in the pay-for-delay context has held that a new cause of action accrues to purchasers upon each overpriced sale of the drug." *Id.* at 746-47; *see In re Nexium (Esomeprazole) Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015); *In re Epipen Epinephrine Injection*, No. 17-2785, 2018 U.S. Dist. LEXIS 140323, at *152-61 (D. Kan. Aug. 20, 2018); *In re Aggrenox Antitrust Litig. ("Aggrenox I")*, 94 F. Supp. 3d 224, 248 (D. Conn. 2015); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 551 (D.N.J. 2004). As such, consistent with the majority of federal courts to consider this issue, the Court finds the continuing-violation doctrine applicable.

Here, Plaintiffs claim to have been overcharged for Effexor XR, as a result of Defendants' settlement agreement. Specifically, from June 2008 through July 2010, Defendants blocked generic extended release venlafaxine from entering the market, which forced consumers to pay a premium for the brand-named drug; thereby, constituting a continuing violation through July 2010. *See Niaspan*, 42 F. Supp. 3d at 746. As such, because EPPs filed their complaints the following year, September 2011, the Court finds EPPs' claims are timely, under the continuing-violation doctrine, and, therefore, denies Defendants' motion as it pertains to these claims.

## III.    Notice Challenges and Permissibility of Pursuing Class Claims

Defendants next make several challenges to EPPs' state antitrust and consumer protection claims. First, Defendants contend that EPPs failed to satisfy the pre-filing notice requirements mandated in states that require same. Second, Defendants argue that Illinois and Tennessee

consumer protection statutes explicitly prohibit the use of class actions to enforce the rights created therein. The Court discusses each challenge in turn.

*1. Pre-Filing Notice Requirements*

Because the Arizona, Nevada, and Utah antitrust laws have notice requirements, Defendants contend that EPPs' antitrust claims in these states must be dismissed since EPPs failed to give proper notice. Defendants' argument is based on the language of the respective state statutes, requiring any antitrust plaintiff to serve that state attorney general a copy of the complaint. *See* Ariz. Rev. Stat. § 44-1415; Nev. Rev. Stat. Ann. § 598A.210(3); Utah Code Ann. § 76-10-3109(9). Similarly, because the consumer protection statutes in Maine, Massachusetts, and West Virginia contain pre-notice provisions, Defendants contend these claims fail as well, since Plaintiffs failed to comply.

The Arizona Uniform Antitrust Act states that "[a] person filing a complaint, counterclaim or answer for any violation of the provisions of this article shall simultaneously with the filing of the pleading in the superior court or, in the case of pendent state law claims in the federal court, serve a copy of the complaint, counterclaim or answer on the attorney general. Proof of service on the attorney general shall be filed with the court." Ariz. Rev. Stat. § 44-1415(a). Similarly, Nevada's Unfair Trade Practices Act states "[a]ny person commencing an action for any violation of the provisions of this chapter shall, simultaneously with the filing of the complaint with the court, mail a copy of the complaint to the Attorney General." Nev. Rev. Stat. Ann. § 598A.210(3). Lastly, the Utah Antitrust Act also requires notice be made to its attorney general. Specifically, the Act states, "[t]he attorney general shall be notified by the plaintiff about the filing of any class action involving antitrust violations that includes plaintiffs from this state. The attorney general shall receive a copy of each filing from each plaintiff. The attorney general may, in his or her

21

discretion, intervene or file amicus briefs in the case, and may be heard on the question of the fairness or appropriateness of any proposed settlement agreement." Utah Code Ann. § 76-10-3109(9).

Finally, Maine, Massachusetts, and West Virginia's consumer protection statutes all include pre-filing notice provisions. Specifically, the Massachusetts Consumer Protection Act requires that "[a]t least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent." Mass. Gen. Laws. Ch. 93A, § 9(3). Courts have recognized that "[t]he statutory notice requirement is not merely a procedural nicety, but, rather, 'a prerequisite to suit.'" *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 19 (1st Cir. 2004) (quoting *Entrialgo v. Twin City Dodge, Inc.*, 333 N.E.2d 202, 204 (Mass. 1975)). Similarly, the West Virginia Consumer Credit Protection Act provides consumers who are victims to unfair, deceptive, and fraudulent business practices with a cause of action. W. Va. Code § 46A-6-106(a). However, prior to initiating suit, a consumer must first inform the seller, in writing, of the alleged violation. W. Va. Code § 46A-6-106(b). Like the Massachusetts statute, courts have interpreted this statute as a "mandatory prerequisite[]" to commencing a consumer protection claim under the Act. *Harrison v. Porsche Cars N. Am., Inc.*, No. 15-0381, 2016 W. Va. LEXIS 245, at *5 (W.Va. 2016); *see also Stanley v. Huntington Nat'l Bank*, No.11-54, 2012 U.S. Dist. LEXIS 9448, at *20-21 (N.D.W.Va. Jan. 27, 2012).

Unlike Massachusetts and West Virginia, while Maine's Unfair Trade Practices Act does include a pre-filing notice provision, the Maine Supreme Court has held that "the notice requirements of section 213(1-A) are not jurisdictional." *Oceanside at Fine Point Condo. Owners Ass'n v. Peachtree Doors*, 659 A.2d 267, 273 (Me. 1995) (citing Me. Rev. Stat. Ann. tit. 5, §

213(1-A)). Therefore, courts have permitted plaintiffs to maintain their Maine Unfair Trade Practices Act claims, despite failing to "send an adequate pre-litigation demand letter." *Chavez v. Wal-Mart Stores, Inc.*, No. 13-6429, 2014 U.S. Dist. LEXIS 194351, at *8 (C.D. Cal. June 2, 2014) (distinguishing Massachusetts' and West Virginia's notice requirements from Maine's). As such, because failure to comply with Maine's pre-filing notice does not preclude a plaintiff from perusing his or her claims under the Act, to the extent Defendants seek judgment under this statute, it is denied.

2.  *State Consumer Protection Class Bar*

Defendants next contend that EPPs' Tennessee[6] consumer fraud claims must be dismissed, since Tennessee prohibits class actions. Tennessee's Consumer Protection Act states, "[a]ny person who suffers an ascertainable loss . . . as a result of . . . an unfair or deceptive act or practice . . . may bring an action individually to recover actual damages." Tenn. Code Ann. § 47-18-109(a)(1). Here, EPPs do not contest the meaning of the above-mentioned statutory provisions; instead, relying on *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010), EPPs contend these statutory provisions are preempted by Federal Rule of Civil Procedure 23, since "federal procedural rules control over conflicting state rules."

3.  *The Shady Grove Decision*

To properly analyze Defendants' motion, the Court must determine whether the discussed notice requirements and class action bars are procedural or substantive. It is blackletter law that that federal courts sitting in diversity jurisdiction must utilize federal procedural law and state

---

[6] Defendants also make a similar argument for Plaintiff's Illinois consumer protection claims; however, being that the Illinois Consumer Fraud & Deceptive Business Practice Act does not explicitly bar class actions, the Court finds it more appropriate to consider the substantive arguments Defendants present later.

substantive law. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). Therefore, if these states' notice requirements and class action bars are substantive in nature, they apply and must be followed in federal court. *See Shady Grove*, 559 U.S. at 410. However, there is no bright line between procedural and substantive law and, thus, the distinction is difficult to determine, especially since these two categories are not mutually exclusive. *Godin v. Schencks*, 629 F.3d 79, 86 (1st Cir. 2010).

In interpreting *Erie,* the Supreme Court explained that a federal law will only be procedural and, thus, applicable, if the case's outcome would be the same in both federal and state courts. *Guaranty Trust Co. v. York*, 326 U.S. 99, 109 (1945). This is consistent with *Erie*'s "twin aims" to avoid forum shopping and the inequitable administration of law. *Id.* at 111-12. The Supreme Court further elaborated that before a court can consider *Erie*'s outcome determinative test, it must first determine whether there is a direct conflict between the federal and state laws in question. *See Hanna v. Plumer*, 380 U.S. 460, 470-74 (1965). If there is a conflict, the federal law must be used, unless it is deemed unconstitutional or outside the scope of the Rules Enabling Act, 28 U.S.C. § 2072(b), which prohibits the use of federal laws if they "abridge, enlarge, or modify any [state] substantive right." *Id.* If there is not a conflict, the outcome determinative test is utilized to determine the whether to apply state or federal law. *Id.* This test has been refined as an inquiry into "whether the scope of the Federal Rule . . . is sufficiently broad to control the issue before the court." *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749-50 (1980). Only if the federal law is sufficiently broad, will the court then continue with the *Hanna* analysis.

Most recently, the Supreme Court was presented with a similar issue that is before the Court. In *Shady Grove*, the Supreme Court was tasked with determining whether Federal Rule of Civil Procedure 23 or a New York law controlled if a class action may proceed in federal court.

559 U.S. at 396. The New York law at issue prohibited the use of class actions to recover a "penalty" or statutory minimum damages. N.Y. Civ. Prac. Law Ann. (CPLR) § 901(b). In *Shady Grove*, the class members met the prerequisites of Rule 23, but sued under Section 901(b) to recover unpaid interest from Allstate, which was classified as a "penalty" and, therefore, not permitted under the New York law. *Id.* at 397. In determining which of the two rules applied, the Supreme Court had to answer two related questions: first, whether the New York rule and Rule 23 addressed the same issue; and, if so, whether Rule 23 was within its statutory authority under the Rules Enabling Act. *Id.* at 398 (citing *Burlington N. R. Co. v. Woods*, 480 U.S. 1, 4-5 (1987); *Hanna*, 380 U.S. at 463-64). In doing so, a majority of the Court concluded that Rule 23's conflict with the New York law was "unavoidable" and could not fairly be read to not "control the issue." *Id.* at 406 n.8. As such, because the New York rule attempted to answer the same question, the Court held "it cannot apply in diversity suits unless Rule 23 is ultra vires." *Id.* at 398-99. Turning to the second inquiry, however, no majority was able to come to an agreed standard. Writing for three justices, Justice Scalia explained that "it is not the substantive or procedural nature of the affected state law that matters, but the substantive or procedural nature of the Federal Rule." *Id.* at 410. As such, the validity of a Federal Rule turns on whether it regulates procedure, if it does, it is lawfully authorized by the Rules Enabling Act. *Id.*

However, in his concurring opinion, Justice Stevens criticized the plurality's categorical approach, at step two, that any federal rule that "really regulates procedure" is a sufficient basis for preempting a conflicting state law. *Id.* at 421-29 (Stevens, J., concurring in part and concurring in judgment). Instead, in Justice Stevens' view, the inquiry should "not necessarily turn on whether the state law at issue takes the form of what is traditionally described as substantive or procedural. Rather, it turns on whether the state law actually is part of a State's framework of substantive rights

or remedies." *Id.* at 419. This is because there may be state procedural rules that "become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy" and, therefore, "make it significantly more difficult to bring or to prove a claim, thus serving to limit the scope of that claim." *Id.* at 420.

Although the Third Circuit has yet to decide whether Justice Stevens' concurrence controls, the Court is persuaded by the majority of district and circuit courts that have done so.[7] *Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 60 (E.D.N.Y. 2017) (collecting cases). In doing so, courts presented with the same issue presently before the Court have framed the inquiry as whether the state statute "provides a procedure that is 'so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy.'" *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 416 (S.D.N.Y. 2011) (quoting *Shady Grove*, 559 U.S. at 420 (Stevens, J. concurring in part and concurring in judgment)); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 409 (D. Mass. 2013). If the answer is in the affirmative, the federal rule must yield to the state law, since it would "effectively abridge[], enlarge[], or modif[y] a state-created right or remedy." *Shady Grove*, 559 U.S. at 422 (Stevens, J. concurring in part and concurring in judgment).

4.    *Application*

Against this legal backdrop, the Court finds that Rule 23 is not "sufficiently broad" to cover the state statutory notice provisions. First, the conflicting rules do not attempt to answer the same question or subject. *See Shady Grove*, 559 U.S. at 399. Here, the state laws in question address notice provisions for antitrust and consumer protection-related lawsuits; Rule 23, on the other

---

[7] From the Court's perspective, in agreement with Justice Stevens, the state statutes at issue focus on various forms of deceptive practices. Rule 23 is more generic and applies to all class actions. As such, the narrower and more focused approach of the state should apply.

hand, is a general federal procedural rule governing class actions. Second, contrary to *Erie*'s twin aims, to decline to apply state statutory notice provisions "in federal court would encourage forum shopping and the inequitable administration of laws." *In re Asacol Antitrust Litig.*, No. 15-12730, 2016 U.S. Dist. LEXIS 94605, at *48 (D. Mass. July 20, 2016). This is also consistent with the majority of district courts that have been presented with the same issue, and have concluded that state statutory notice provisions control in federal court. *See Asacol*, 2016 U.S. Dist. LEXIS 94605, at *48 (statutory notice provisions in Arizona, Hawaii, Nevada, and Utah apply in federal court); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1158 (N.D. Cal. 2009); *see also Chavez*, 2014 U.S. Dist. LEXIS 194351, at *8 (dismissing Massachusetts and West Virginia consumer protection claims for failing to comply with pre-litigation demand requirements). Accordingly, because EPPs failed to comply with the notice provisions under Arizona's Uniform Antitrust Act, Nevada's Unfair Trade Practices Act, and Utah's Antitrust Act, as well as Massachusetts's Consumer Protection Act and West Virginia's Consumer Credit Protection Act, EPPs' class claims under these statutes are dismissed without prejudice. However, as noted above, because Maine's pre-filing notice requirement is not jurisdictional in nature, Defendants' motion for judgment as to this statute is denied.

For these same reasons, the Court also finds that the class action bar incorporated in Tennessee's consumer protection law is not preempted by Rule 23. Here, EPPs deviate from the majority of district and circuits, which have followed Justice Steven's concurrence in *Shady Grove*, and, instead, endorse the approach taken in *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 133, 1335 (11th Cir. 2015). In *Lisk*, the Eleventh Circuit held that there was "no relevant, meaningful distinction between" the New York law in *Shady Grove* and the Alabama Deceptive Trade Practices Act, which also bars class actions. In doing so, the court, echoing Justice Scalia's

plurality decision, explained, "the question whether a federal rule abridges, enlarges, or modifies a substantive right turns on matters of substance—not on the placement of a statute within a state code." *Id.* at 1336. However, "[t]he decision in *Lisk* has not been widely followed outside of the Eleventh Circuit." *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-4427, 2017 U.S. Dist. LEXIS 186408, at *23 (E.D.N.Y. Nov. 8, 2017). Instead, "most courts outside of that circuit implicitly or explicitly disagree[] with its interpretation of *Shady Grove* and its determination that there was no 'meaningful distinction'" between the New York law in *Shady Grove* and the Alabama class action bar. *Id.* (collecting cases). As such, consistent with the courts to have considered this issue, the Court finds that the class action bar in Tennessee controls in federal court. *Id.* at *23-24. Moreover, in *Delgado*, the court explained, "the specific inclusion of the class action bar within the Alabama, Tennessee, and Georgia consumer protection statutes . . . evinces a desire by the state legislature to limit not only the form of the action but also the remedies available, placing those bars squarely within Justice Stevens' concurrence." *Id.;*[8] *Fejzulai v. Sam's West, Inc.*, 205 F. Supp. 3d 723, 728-29 (D.S.C. 2016). That same reasoning holds here.

In sum, the Court finds that the three notice provisions under Arizona, Nevada, and Utah antitrust laws are applicable here and Plaintiffs failed to comply. Likewise, the notice provisions under Massachusetts and West Virginia's consumer protection laws control. As such, EPPs' claims under these five statutes are dismissed without prejudice; Plaintiffs may file an amended complaint that specifically pleads compliance with each state's notice requirement. Similarly,

---

[8] Both Alabama and Georgia's consumer protection statutes contain similar language to Tennessee, which prohibit the use of class actions to enforce the rights created therein. Ala. Code Ann. § 8-19-10(f) ("A consumer or other person bringing an action under this chapter may not bring an action on behalf of a class"); Ga. Code Ann. § 10-1-399(a) ("Any person who suffers injury or damages . . . as a result of consumer acts or practices in violation of this part . . . may bring an action individually, but not in a representative capacity").

EPPs' class claims under Tennessee's consumer protection statute are dismissed without prejudice; Plaintiffs may amend their complaint to include only claims in their *individual* capacities. Lastly, because the failure to provide pre-file notice under Maine's Unfair Trade Practices Act does not bar pursuing a claim under the Act, Defendants' motion for judgment as it relates to this statute is denied.

## IV.    State Antitrust Claims

*1.    Article III Standing*

Defendants first challenge EPPs' antitrust claims under the laws of the District of Columbia, since they lack Article III standing. Plaintiffs do not dispute the fact that the Complaint does not name a plaintiff that resides in the District of Columbia or that any named plaintiff made a purchase or reimbursement for Effexor XR; instead, they contend that since named plaintiffs have Article III standing to pursue their own antitrust claims, they have Article III standing to assert claims under the laws of the District of Columbia. The Court disagrees.

Article III standing is a threshold inquiry in every case and one in which "[t]he party invoking federal jurisdiction bears the burden of [proof]." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To establish Article III standing, a plaintiff must demonstrate: "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 359 (3d Cir. 2015) (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014)). In a putative class action, standing must be analyzed on a claim-by-claim basis, with the plaintiff bearing the burden of demonstrating standing for each claim he seeks to prove, "we do not exercise jurisdiction over one claim simply because it arose 'from the same 'nucleus of operative fact' as another claim." *Id.* (quoting *DaimlerChrystler Corp. v. Cuno*, 547

U.S. 332, 352 (2015)). Put differently, "the named plaintiffs may bring suit only under the laws of states in which they reside or in which they either purchased or made reimbursements for [brand-named drug]." *Niaspan*, 42 F. Supp. 3d at 758 (citing *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 533 (E.D. Pa. 2010)).

Here, EPPs Complaint fails to allege that any named plaintiff either resides in or made purchases and/or reimbursement for Effexor XR in the District of Columbia. Moreover, the Court is unpersuaded by EPPs' proposition that because they have Article III standing in some states, they can assert claims in any state; since this would effectively render the Article III inquiry obsolete. As such, because EPPs lack Article III standing to assert claims in the District of Columbia, the Court grants Defendants' motion as it pertains to this claim without prejudice. *See Niaspan*, 42 F. Supp. 3d at 758; *Wellbutrin XL*, 260 F.R.D. at 157-58.

2.      *Illinois Brick Challenges*

Defendants next seek dismissal of EPP's Illinois, Rhode Island, and Utah state antitrust claims, since these states lack standing under *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746-47 (1977). In *Illinois Brick*, the Supreme Court held that indirect purchasers lacked Article III standing to assert federal antitrust claims against manufacturers since their injury was likely only a small portion of the injury caused by the defendants' alleged conduct. *Id.* at 725-26.

a.      Illinois Antitrust Act

Relying on *Illinois Brick*, Defendants contend that EPPs' Illinois antitrust claim fails, since they lack standing. The plain language of the Illinois Antitrust Act ("IAA") states "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General, who may maintain an action parens patriae." 740 Ill. Comp. Stat. § 10/7(2). EPPs respond, contending that under

*Shady Grove*, the Court should treat the Illinois Antitrust Act as a procedural law and, therefore, follow Rule 23.

District courts are divided on whether the Illinois Antitrust Act precludes indirect purchasers from filing class actions. However, a majority of courts have held that the Act is distinguishable from the New York law in *Shady Grove* and that it prohibits indirect purchaser class actions. *See, e.g.*, *In re Opana Er Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016); *United Food & Commer. Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1083-84 (N.D. Cal. 2014); *Digital Music*, 812 F. Supp. 2d at 415-16; *Wellbutrin XL*, 756 F. Supp. 2d at 677. As discussed above, the New York law at issue in *Shady Grove* involved a general procedural rule that conflicted with Rule 23; here, however, the limitation prescribed in the IAA is "in the same paragraph of the same statute that creates the underlying substantive right." *Digital Music*, 812 F. Supp. 2d at 416; *see also Wellbutrin XL*, 756 F. Supp. 2d at 677. Further, the restrictions in the Illinois Antitrust Act appear to reflect a policy decision regarding the feasibility of duplicative recovery, which is explicitly entrusted to the attorney general, not indirect purchasers. *Wellbutrin XL*, 756 F. Supp. 2d at 677 (citing *Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F. 2d 1469, 1480 (7th Cir. 1991)). In finding that the Act bars indirect purchaser antitrust class actions, courts have explained "[t]he Illinois restrictions on indirect purchaser actions are intertwined with Illinois substantive rights and remedies . . . [such that] application of Rule 23 would 'abridge, enlarge or modify' Illinois' substantive rights, and therefore Illinois' restrictions on indirect purchaser actions must be applied in federal court." *Id.*; *see also Nexium*, 968 F. Supp. 2d at 408-09; *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-2503, 2015 U.S. Dist. LEXIS 125999, at *66 (D. Mass.

Aug. 14, 2015) (holding that it would be inconsistent with *Shady Grove* to conclude that Rule 23 preempts the ban on class actions contained within Illinois Antitrust Law).

Several district courts have taken a less restrictive interpretation of the Illinois Antitrust Act and have allowed indirect purchasers to bring class actions under the Act. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 817-18 (N.D. Ill. 2017); *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 729 (S.D.N.Y 2017); *In re Aggrenox Antitrust Litig. (Aggrenox II)*, No. 14-2516, 2016 U.S. Dist. LEXIS 104647, at *23-28 (D. Conn. Aug. 9, 2016). In *Broiler Chicken*, the Northern District of Illinois held that Rule 23 applies in federal court, despite the state law's requirement that the attorney general bring class actions, since the Act does not hinder the class's substantive rights. *Broiler Chicken*, 290 F. Supp. 3d at 818. This is "because any indirect purchaser procedurally blocked from participation in a class action would still have the same remedy in an individual action." *Aggrenox II*, 2016 U.S. Dist. LEXIS 104647, at *28. As such, these courts view the Illinois Antitrust Act as a procedural conflict with Rule 23, rather than substantive, and, therefore, apply Rule 23 to permit indirect purchasers to file class actions under the Act, so long as they satisfy its prerequisites. *See, e.g.*, *Propranolol.*, 249 F. Supp. 3d at 728.

Although district courts have taken different approaches in interpreting the Illinois Antitrust Act, the Court finds the rationale of *Digital Music* persuasive. The language of the Act presents a substantive conflict with Rule 23; as such, since the Illinois Antitrust Act controls, the Court finds that EPPs lack standing to assert claims under the Act and, therefore, dismisses this claim with prejudice.

<u>b.</u>        <u>Rhode Island Antitrust Act</u>

Defendants next move for dismissal of EPPs Rhode Island antitrust claims since they, too, lack standing to bring an antitrust claim under *Illinois Brick*. Since the Supreme Court's decision, multiple states have enacted *Illinois Brick* repealer statutes that allow indirect purchasers to recover under their state law. On July 15, 2013, Rhode Island passed such a repealer, which states "[t]he fact that a person or public body has not dealt directly with the defendant shall not bar or otherwise limit recovery." R.I. Gen. Laws § 6-36-7(d). As such, Plaintiffs argue the statute should be applied retroactively and, even if it cannot be applied retroactively, they nevertheless fall within the repealer's protection since Plaintiffs suffered damages past July 15, 2013.

Here, Defendants argue that the activity alleged in this claim predated July 15, 2013, since the alleged anticompetitive conduct that prevented the generic brands from entering the market occurred prior to July 2010. As such, since the conduct giving rise to the present cause of action occurred prior to the passing of Rhode Island's repealer, Defendants contend it does not apply and, under *Illinois Brick*, must be dismissed. In addition, Defendants aver that the statute cannot be applied retroactively.

Under Rhode Island law, it is well established that statutes cannot be applied retroactively, unless clearly stated. The Rhode Island Supreme Court has held that, "statutes and their amendments are construed to operate prospectively unless a specific contrary intent is expressed by the Legislature, or retroactivity must necessarily be inferred from the language employed by the law makers." *State v. Jennings,* 944 A.2d 171, 173 (R.I. 2008); *see also Rodrigues v. State,* 985 A.2d 311, 318 (R.I. 2009); *Wilkinson v. State Crime Lab. Comm'n*, 788 A.2d 1129, 1140-41 (R.I. 2002); *Hydro-Manufacturing v. Kayser-Roth Corp.*, 640 A.2d 950, 954-55 (R.I. 1994). Additionally, courts have consistently held that the Rhode Island repealer applies

prospectively. *See, e.g.*, *Aggrenox I,* 94 F. Supp. 3d at 252-53; *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, No. 14-2508, 2015 U.S. Dist. LEXIS 121620, at *63, (E.D. Tenn. July 24, 2015); *Niaspan*, 42 F. Supp. 3d at 759. Finally, Plaintiffs' contention that Defendants' conduct has continued past July 15, 2013, thereby placing it within the repealer's protection, is belied by the explicit allegations set forth in their Complaint, which focus solely on Defendants' actions made prior to July 2010. As such, because Rhode Island's repealer does not apply retroactively and none of the activity giving rise to their claims occurred after the date of enactment (July 15, 2013), EPPs' Rhode Island antitrust claims are dismissed with prejudice.

c.      Utah Antitrust Act

Lastly, in addition to failing to provide notice, Defendants contend that EPPs' Utah antitrust claims fail, since none of the named Plaintiffs are Utah residents, as required under Utah law. As such, Defendants contend that EPPs lack standing to assert claims under the Utah Antitrust Act. *See Niaspan*, 42 F. Supp. 3d at 759-60. Plaintiffs respond that dismissal is not warranted, since only a member of a putative class must be from Utah. *See In re Liquid Aluminum Sulfate Antitrust Litig.*, No. 16-2687, 2017 U.S. Dist. Lexis 115294, at *112-13 (D.N.J. July 20, 2017).

Under the Utah Antitrust Act, "[a] person who is a *citizen* of this state or a *resident* of this state" can bring a claim. Utah Code Ann. § 76-10-3109(1)(a) (emphasis added). The majority of courts that have been presented with this statute require at least one Utah citizen or resident be a named plaintiff. *See Opana Er*, 162 F. Supp. 3d at 725; *Aggrenox I.*, 94 F. Supp. 3d at 251-52; *Niaspan*, 42 F. Supp. 3d at 759-60; *Nexium,* 968 F. Supp. 2d at 410; *In Re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 U.S. Dist. LEXIS 121373, at *30 n.10 (D.N.J. Oct. 20, 2011). Here, neither party disputes that none of the named Plaintiffs are Utah residents or citizens. As such, guided by the majority of courts to address this issue, because there must be at least one

named plaintiff who is a Utah citizen or resident in order to establish standing for the putative class, EPPs' claims under the Utah Antitrust Act are dismissed without prejudice.

In sum, EPPs' antitrust claims under Illinois and Rhode Island are dismissed and there is no right to amend due to futility. Under Utah, the claim is dismissed without prejudice; but Plaintiff may amend to name such plaintiff within thirty days.

3.    *States Requiring Concerted Action*

Defendants next seek dismissal of Count I of EPPs' Kansas, New York, and Tennessee antitrust claims, which asserts a single claim of monopolization against Wyeth, based on committing fraud before the PTO and commencing baseless patent litigation. (TAC ¶¶ 420-37). Specifically, Defendants argue that because Kansas, New York, and Tennessee require unlawful behavior between two or more individuals, Count I must be dismissed since it alleges unilateral conduct by Wyeth.

It is clear from the Complaint that the allegations concerning Wyeth's conduct before the PTO, as well as its sham litigation, are unilateral. As such, since these allegations describe unilateral conduct, Defendants contend that Count I fails in Kansas, New York and Tennessee. *See* Kan. Stat. Ann. §§ 50-101, -112, -132; N.Y. Gen. Bus. Law § 340(1); Tenn. Code Ann. §§ 47-25-101, -102.

The Kansas Monopolies and Unfair Trade Act proscribes "all arrangements, contracts, agreements, trusts, or combinations between persons made with a view or which tend to prevent full and free competition" and those "designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles." Kan. Stat. Ann. § 50-112. The Act defines a "trust" as a "combination of capital, skill, or acts, by two or more persons" and prohibits conspiracy or combination "with any other persons . . . for the purpose

of monopolizing any line of business." Kan. Stat. Ann. §§ 50-101, -132. While there is scant case law interpreting the Kansas Monopolies and Unfair Trade Act, the Kansas Court of Appeals has held that since the Act emphasizes agreements between two or more individuals, the legislature intended for the Act to require more than unilateral conduct. *Smith v. Philip Morris Cos.*, 335 P.3d 644, 662-67 (Kan. Ct. App. 2014*); see also In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 283 (D. Mass. 2004).

Like Kansas, the New York Donnelly Act defines an antitrust violation as "every contract, agreement, arrangement, or combination whereby a monopoly in the conduct of any business, trade, or commerce . . . may be established or maintained, or whereby competition or the free exercise of any activity in the conduct of any business, trade, or commerce . . . is or may be restrained." N.Y. Gen. Bus. Law § 340(1). As such, in New York "[a]n antitrust claim under the Donnelly Act...must allege both concerted action by two or more entities and a consequent restraint of trade within an identified relevant product market." *Global Reins. Corp.-U.S. Branch v. Equitas Ltd.*, 969 N.E. 2d 187, 192 (N.Y. 2012); *see also In re Aluminum Warehousing Antitrust Litig.* No. 13-2481, 2014 U.S. Dist. LEXIS 140765, at *23 (S.D.N.Y. Sept. 14, 2014). However, the Northern District of New York has held that allegations of monopolistic activities, based on conspiring with other individuals, suffices to state a claim under the Donnelly Act. *See N. Cnty. Communs. Corp. v. Verizon N.Y. Inc.*, 233 F. Supp. 2d 381, 385 (N.D.N.Y. 2002).

Finally, like Kansas and New York, the Tennessee Trade Practices Act proscribes "[a]ll arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition . . . and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the

consumer." Tenn. Code Ann. § 47-25-101. Despite limited case law interpreting the statute, several district courts have held that "the absence of an arrangement or conspiracy between two actors is a bar" to a claim under the Tennessee statute. *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 445-46 (E.D. Pa. 2010); *see also In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1108-09 (N.D. Cal. 2007); *Relafen*, 221 F.R.D. at 284.

As established above, the case law as well as the plain language of the Kansas, New York, and Tennessee antitrust statutes require concerted action between two parties. As such, allegations relating to Wyeth's unilateral conduct fails to state a claim under these statutes. The Court is not persuaded by Plaintiffs' argument that all alleged conduct falls within a single cause of action. Therefore, Defendants' motion as it relates to Kansas, New York, and Tennessee are granted in part and denied in part. To the extent Count I is based on Wyeth committing fraud before the PTO and commencing baseless patent litigation, Defendants' motion is granted, since the conduct is unilateral. However, the Court denies Defendants' motion to the extent that they seek dismissal of Count I based on the reverse settlement agreement with Teva.

## V.    State Law Consumer Protection Claims

Defendants next challenge the sufficiency of EPPs' state consumer protection claims. The Court discusses each state individually.[9]

---

[9] Because the Court has already dismissed EPPs' claims under Massachusetts, Tennessee and West Virginia's consumer protection statutes, it does not address the remaining arguments pertaining to these states.

*1.    California*

Defendants first seek dismissal of EPPs' claims under the California Unfair Competition Law, since EPPs failed to plead reliance. The Unfair Competition Law proscribes "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. As such, courts have understood Section 17200 to provide relief for three varieties of unfair competition: "practices which are unlawful, unfair, or fraudulent." *Ditropan XL*, 529 F. Supp. 2d at 1105. However, contrary to Defendants' assertion, reliance is only required "when a[n] [Unfair Competition Law] claim is premised on allegations that the Defendants engaged in fraudulent business practices." *Id.* at 1106. Here, EPPs claims are predicated on unlawful and unfair business practices engaged by defendants. Specifically, Plaintiffs challenge, among other things, Defendants' sham litigation, fraudulent procurement of the PTO, and reverse settlement agreement. As such, "at the very least, [EPPs] allege a claim premised on the unfair prong." *Id.*; *see also Wellbutrin*, 260 F.R.D. at 160. Therefore, because EPPs allege sufficient facts to sustain an Unfair Competition Law claim based on unfair business practices, Defendants' motion for judgment on the pleadings with respect to this claim is denied.[10]

*2.    Illinois*

Defendants next seek dismissal of EPPs' claims under the Illinois Consumer Fraud and Deceptive Business Practices Act since: (1) the Act does not provide additional relief beyond antitrust claims; (2) EPPs failed to plead deception or reliance; and (3) EPPs fail to demonstrate that the alleged conduct was consumer-oriented or had a consumer nexus. The Illinois Consumer Fraud and Deceptive Business Practices Act states that "[u]nfair methods of competition and unfair

---

[10] Moreover, it should be noted that, at the pleading stage it is difficult to determine whether Plaintiff's claims under California law are even based on fraudulent conduct; as such, the Court also finds Defendants' motion to be premature.

or deceptive acts or practices . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 Ill. Comp. Stat. Ann. 505/2. However, the state legislature did not intend for the Act to serve as an "additional antitrust enforcement mechanism." *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 993 (Ill. 1990) (consumer fraud statutes cannot be used when conduct is not actionable under the state antitrust law); *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1046-48 (N.D. Ill. 2007) (consumers can bring a consumer fraud claim when conduct is actionable under the Illinois Antitrust Act). As such, if the plaintiff fails to plead an antitrust claim under the Illinois Antitrust Act, those same allegations of anticompetitive conduct cannot give rise to a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act. *Id.*; *Siegel*, 480 F. Supp. 2d at 1034; *Wellbutrin XL*, 260 F.R.D. at 162.

As discussed above, the Illinois Antitrust Act prohibits indirect purchaser class actions. Moreover, when reviewing the Complaint, EPPs' claims are primarily focused on anticompetitive conduct and its "allegations of consumer fraud overlap entirely with the allegations of anticompetitive conduct." *Wellbutrin XL*, 260 F.R.D. at 162 (quoting *Gaebler v. New Mexico Potash Corp.*, 676 N.E.2d 228, 230 (Ill. App. Ct. 1996)). Simply put, "plaintiffs may not assert what are essentially antitrust claims in the guise of a claim under [the Illinois Consumer Protection Act]." *Id.* Since any amendment would be futile, judgment on the pleadings is granted without leave to amend.

*3.    Maine*

Defendants next seek dismissal of EPPs' claims under the Maine Unfair Trade Practices Act, since EPPs failed to allege deception and, alternatively, EPPs are not considered "consumers" under the Act. The Act proscribes "[u]nfair methods of competition and unfair or deceptive acts

or practices in the conduct of any trade or commerce." Me. Rev. Stat. tit. 5 § 207. "A business practice is 'unfair' if the injury it produces is (1) 'substantial,' (2) not 'outweighed by any countervailing benefits to consumers or competition that the practice produces,' and (3) not reasonably avoidable by consumers." *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 584 (M.D. Pa. 2009) (quoting *Tungate v. MacLean-Stevens Studios, Inc.*, 714 A.2d 792, 797 (Me. 1998)). "In pricing cases, the allegedly unfair practice must also induce the consumer to acquire something that he or she would not otherwise have purchased." *Id.* However, whereas here, the purported conduct resulted in higher prices, the Maine Unfair Trade Practices Act provides no such relief, since higher prices do not induce a consumer to make purchases. *In re Graphics Processing Units (GPU) Antitrust Litig.*, 527 F. Supp. 2d 1011, 1031 (N.D. Cal. 2007). As such, since any amendment to EPPs' claims under the Maine Consumer Protection Act would be futile, judgment on the pleadings is granted without leave to amend. *See Chocolate Confectionary*, 602 F. Supp. 2d at 585.

It is worth briefly noting that the court is unpersuaded by Plaintiff's reliance on *In re Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160 (D. Me. 2004), which held that deception or reliance only applies to "unfair or deceptive acts," not "unfair methods of competition." *Id.* at 186-87. First, federal courts have criticized the rationale in *In re Motor Vehicles*, concluding that its "crabbed reading of *Tungate*" is incongruent with the Maine Supreme Court's holding since "[t]he Maine Supreme Court [did] not qualify its pronouncement as applicable to only 'unfair or deceptive acts.'" *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 787 (N.D. Ohio 2011) (quoting *Flash Memory*, 643 F. Supp. 2d at 1159); *see also Chocolate Confectionary*, 602 F. Supp. 2d at 584-85; *In re TFT-LCD Antitrust Litig.*, 586 F. Supp. 2d 1109, 1126-27 (N.D. Cal. 2008). Second, the allegations in that case concerned group boycotts,

not price fixing or reverse settlements, which the *In re Motor Vehicles* court reasoned would nevertheless support an unfair method of competition claim.

4. *Nevada*

Defendants argue that EPPs claims under the Nevada Deceptive Trade Practices Act should be dismissed, since EPPs failed to allege consumer reliance. Under Section 41.600 of Nevada's Revised Statutes, "any person who is a victim of . . . [a] deceptive trade practice as defined in [the Nevada Deceptive Trade Practices Act]" may a bring an action thereunder. Nev. Rev. Stat. § 41.600. Some courts have held that when a plaintiff seeks relief based on prohibited acts listed under Section 598.0915, the plaintiff is required to demonstrate deception or reliance. *See, e.g., Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 657 (D. Nev. 2009); *Sheet Metal Workers*, 737 F. Supp. 2d at 417. However, contrary to Defendants' contention, EPPs' claims do not arise under Section 598.0915; instead, EPPs' claims appear to be predicated on Section 598.0923(3), which states that "[a] person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly . . . violates state or federal statute or regulation relating to the sale or lease of goods or service." Nev. Rev. Stat. § 598.0923(3).

Under Section 598.0923(3), the Nevada Deceptive Trade Practices Act does not require the plaintiff to plead reliance, nor do Defendants identify any case-law that would otherwise support this contention. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 98 (D. Mass. 2008) (parties agreeing that the Nevada Deceptive Trade Practices Act does not require proof of reliance); *see also In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1080-81 (S.D. Cal. 2017) (rejecting the defendant's motion to dismiss the end purchaser plaintiff's Nevada Deceptive Trade Practices Act claims, arising from an alleged antirust conspiracy regarding packaged seafood products). As such, since EPPs' claims are predicated on

allegations of anticompetitive conduct, which are considered prohibited acts under Nev. Rev. Stat. § 598A.060(a), the Court denies Defendants' motion for judgment on the pleadings.

*6. New Mexico*

Defendants next challenge EPPs' claims under the New Mexico Unfair Practices Act, since the Act does not provide relief for price fixing and, in any event, they fail to plead unconscionable conduct. The New Mexico Unfair Practices Act prohibits unfair, deceptive, and unconscionable trade practices. N.M. Rev. Stat. § 57-12-2. Given the remedial nature of the Act, "courts construe its provisions broadly to facilitate this purpose." *Chocolate Confectionary*, 602 F. Supp. 2d at 585 (citing *State ex rel. Stratton v. Gurley Motor Co.*, 737 P.2d 1180, 1185 (N.M. 1987)). The Act defines "unconscionable trade practice" as "an act or practice in connection with the sale . . . of any goods or services . . . that to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid." N.M. Stat. Ann. § 57-12-2(E).

"Federal courts generally permit [New Mexico Unfair Practices Act] actions in price-fixing cases provided that the plaintiff alleges a 'gross disparity' between the price paid for a product and the value received." *Chocolate Confectionary*, 602 F. Supp. 2d at 585 (collecting cases); *see also Flash Memory*, 643 F. Supp. 2d at 1159-60; *Liquid Aluminum Sulfate*, 2017 U.S. Dist. LEXIS 115294, at *108-09; *In re Aftermarket Filters Antitrust Litig.*, No. 08-4883, 2009 U.S. Dist. LEXIS 104114, at *37 (N.D. Ill. Nov. 5, 2009). Unlike *GPU*, 527 F. Supp. 2d at 1029-30, where the court dismissed the plaintiffs' New Mexico Unfair Practices Act for failing to plead unequal bargaining power, the Court is satisfied that, at this juncture, that EPPs have sufficiently pled enough facts to state a claim under the New Mexico statute. EPPs Complaint is replete with allegations of price

fixing and anticompetitive schemes, and it is beyond cavil that these schemes resulted in consumers paying a substantial premium for goods beyond what they would have otherwise paid. *See TFT-LCD*, 586 F. Supp. 2d at 1127 (allegations of price fixing and "gross disparity" between the value of products received and amount paid sufficient to state a claim under the New Mexico Unfair Practices Act). As such, the Court denies Defendants' motion for judgment on the pleadings as to EPPs' New Mexico Unfair Practices Act claims.

7.    *New York*

Defendants next challenge EPPs' claims under the New York Consumer Protection from Deceptive Acts and Practices Act, since EPPs fail to allege particular conduct directed specifically at them and, in the alternative, fail to allege consumer reliance. Section 349 of New York's Business Law states, "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a). "[S]ection 349 is directed at wrongs against the consuming public." *In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 613 (S.D.N.Y. 2005) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995)). In order to state a claim under Section 349, the plaintiff must prove three elements: (1) "the challenged act or practice was consumer-oriented;" (2) "it was misleading in a material way;" and (3) "the plaintiff suffered injury as a result of the deceptive act." *Flash Memory*, 643 F. Supp. 2d at 1160 (quoting *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000)). "To satisfy the consumer-oriented prong, plaintiffs need only allege consumer-oriented conduct that implicates the public interest in New York." *In re Dynamic Random Access Memory Antitrust (DRAM II) Litig.*, 536 F. Supp. 2d 1129, 1144-45 (N.D. Cal. 2008)).

Here, contrary to Defendants' assertion, the Court is satisfied that EPPs have alleged sufficient facts to sustain a claim under Section 349. As discussed above, EPPs' claims focus on the anticompetitive conduct of Defendants, which prevented the earlier market entry of generic Effexor XR and, as a result, caused individuals to pay a premium. *See MacQuarie Grp. Ltd. v. Pac. Corporate Grp., LLC*, No. 08-cv-2113, 2009 U.S. Dist. LEXIS 16554, at *23-25 (S.D. Cal. Mar. 2, 2009) (recognizing that "courts routinely treat[] antitrust violations as deceptive acts"); *see also New York v. Feldman*, 210 F. Supp. 2d 294, 302 (S.D.N.Y. 2002)). In fact, similar allegations were made in both *TFT-LCD*, 586 F. Supp. 2d at 1128-29, and *DRAM II*, 536 F. Supp. 2d at 1143-44, where the district courts denied the defendants' motions to dismiss, finding the plaintiffs alleged sufficient facts to state a claim. As such, for these reasons, the Court denies Defendants' motion as to EPPs' Section 349 claims.

8.    *North Carolina*

Defendants next contend that EPPs lack standing to assert claims under North Carolina's Unfair and Deceptive Trade Practices Act, since Plaintiffs are neither competitors nor in commercial dealings with Defendants. Section 75-1.1 of the Act proscribes "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce" and provides "any person" or "business of any person, firm or corporation" the right to sue for injuries arising from unfair business practices. N.C. Gen. Stat. §§ 75-1.1; -16. "Federal courts interpreting the [North Carolina's Unfair and Deceptive Trade Practices Act] have allowed claims asserted by businesses against one another as long as the challenged practices affect commerce or the marketplace." *Sheet Metal Workers*, 737 F. Supp. 2d at 419. Here, as discussed, EPPs claim that Defendants engaged in anticompetitive schemes, which ultimately resulted in consumers purchasing Effexor XR at inflated prices. This suffices, under the Act, to confer EPPs

with standing; as such, Defendants' motion for judgment on the pleadings is denied. *See id.* The Court only adds that Defendants' reliance on *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 519-20 (4th Cir. 1999) is of no moment. In *Food Lion*, the Fourth Circuit held that the plaintiffs could not bring a claim against the defendant under the Act, despite engaging in deceptive conduct, since the conduct "did not harm the consuming public." *Id.* at 520. Here, unlike *Food Lion*, EPPs' allegations that Defendants' anticompetitive scheme resulted in consumers paying inflated costs for Effexor XR demonstrates a harm to the "consuming public."

9.    *Rhode Island*

Finally, Defendants challenge EPPs' claims under the Rhode Island Unfair Trade Practices and Consumer Protection Act, since: (1) the misconduct alleged in the Complaint is not prohibited under the Act and (2) EPPs are not "consumers" as defined under the Act. The Rhode Island Unfair Trade Practices and Consumer Protection Act proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." R.I. Gen. Laws § 6-13.1-2. The Act goes on to list twenty "acts or practices" that are considered unfair or deceptive competition. R.I. Gen. Laws § 6-13.1-1(6)(i)-(xx). In determining whether a practice is "unfair" under the Act, courts must consider: "(1) whether the practice affronts public policy, as delineated by the common law, statutes, and 'other established concept[s] of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen).'" *Chocolate Confectionary*, 602 F. Supp. 2d at 587 (quoting *Ames v. Oceanside Welding and Towing Co., Inc.*, 767 A.2d 677, 681 (R.I. 2001)).

The Court finds Defendants' first argument unconvincing. The majority of courts that have been presented with this issue have held that the three prong *Ames* standard "encompass price-

fixing injuries, and [therefore] consumers subject to collusive pricing possess a cognizable claim under the [Act]." *Chocolate Confectionary*, 602 F. Supp. 2d at 587; *TFT-LCD*, 586 F. Supp. 2d at 1129-30; *DRAM II*, 536 F. Supp. 2d at 1144-45. As such, since EPPs allege anticompetitive conduct, which resulted in consumers purchasing Effexor XR at a premium rate, EPPs have sufficiently alleged unfair conduct under the Rhode Island Unfair Trade Practices and Consumer Protection Act. *See DRAM II,* 536 F. Supp. 2d at 1145 (allegations that the defendants engaged price fixing "offend[s] public policy as has been established by statute and/or common law").

Alternatively, Defendants seek dismissal of EPPs' Rhode Island Unfair Trade Practices and Consumer Protection Act claims since they are not "consumers" within the meaning of the Act. The Act limits claims to "[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes." R.I. Gen. Laws § 6-13.1-5.2(a). Citing no supporting case law, EPPs contend that the Act defines "person" to include entities such as corporations, trusts, and associations. However, contrary to EPPs' assertion, "the Rhode Island Supreme Court has construed the [Rhode Island Unfair Trade Practices and Consumer Protection Act]to require that only natural persons are permitted to bring private rights of actions under the statute." *In re Dynamic Random Access Memory (DRAM I) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1117 (N.D. Cal. 2007) (citing *ERI Max Entm't, Inc. v. Streisand*, 690 A.2d 1351, 1354 (R.I. 1997)); *see also TFT-LCD*, 586 F. Supp. 2d at 1130 (same); *Sheet Metal Workers*, 737 F. Supp. 2d at 423 (same). As such, Defendants' motion for judgment on the pleadings is granted. "However, because there may be unusual circumstances under which a business entity may be able to allege that its purchases were primarily for personal, family or household purposes, the Court will not preclude plaintiffs from amending the complaint to allege such a claim on behalf of business entities." *TFT-LCD*, 586 F. Supp. 2d at 1130.

To sum up, the Court declines to grant judgment as to EPPs' consumer protection claims in California, Nebraska, New Mexico, New York, and North Carolina. However, the Court grants Defendants' motion, without leave to amend as to EPPs' Illinois and Maine consumer protection claims; and *with* leave to amend with regards to EPPs' Rhode Island consumer protection claims.

## ORDER

IT IS on this 18th day of September, 2018,

**ORDERED** that Defendants' Motion for Judgment on the Pleadings (ECF No. 755) is **GRANTED IN PART** and **DENIED IN PART** as follows:

- Defendants' Motion for Judgment on the Pleadings based on preemption principles is **DENIED**;

- Defendants' Motion for Judgment on the Pleadings based on statute of limitations is **DENIED**;

- Defendants' Motion for Judgment on the Pleadings as to EPPs' state consumer protection claims in California, Nevada, New Mexico, New York, and North Carolina is **DENIED**.

- Defendants' Motion for Judgment on the Pleadings as it pertains to EPPs' Arizona, Nevada, and Utah antitrust claims is **GRANTED WITHOUT PREJUDICE**; EPPs are granted leave to amend their Complaint to plead compliance with these notice provisions and, with regards to Utah, include a named plaintiff from Utah;

- Defendants' Motion for Judgment on the Pleadings as it pertains to EPPs' antitrust claims under the laws of the District of Columbia is **GRANTED WITHOUT PREJUDICE**;

- Defendants' Motion for Judgment on the Pleadings as it pertains to EPPs' Massachusetts, West Virginia, Rhode Island, and Tennessee consumer protection claims is **GRANTED WITHOUT PREJUDICE**; EPPs are granted leave to amend their Complaint to plead compliance with Massachusetts and West Virginia's notice provisions, individual claims in Tennessee, and consumer claims under Rhode Island;

- Defendants' Motion for Judgment on the Pleadings as it pertains to EPPs' Illinois and Rhode Island antitrust claims, and EPPs' Illinois and Maine consumer protection claims is **GRANTED WITH PREJUDICE**;

- Defendants' Motion for Judgment on the Pleadings as to Count I of EPPs' Complaint under Kansas, New York, and Tennessee is **GRANTED** to the extent these claims are predicated on unilateral activity by Wyeth.

- EPPs have thirty (30) days from the filing of this Memorandum and Order to file an Amended Complaint, consistent with this Memorandum.


_____
PETER G. SHERIDAN, U.S.D.J.